Slip Op. 10-98

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                         :

HORIZON LINES, LLC,          :

                         :

          Plaintiff,        :

                         :

          v.             :     Before: Jane A. Restani, Chief Judge

                         :

UNITED STATES,           :     Court No. 05-00435

                         :

          Defendant.    :

_____:

## OPINION

[After trial, expenses incurred by plaintiff for ship's lay-up found not to be dutiable "expenses of repairs" under 19 U.S.C. § 1466(a). Upon appropriate submission, judgment in Customs valuation action will be entered for plaintiff. Defendant's motion in limine is denied. Plaintiff's trial exhibits 2, 3, 6, 11, and 21 are admitted as evidence.]

Dated: August 31, 2010

Williams Mullen (Evelyn M. Suarez, Dean A. Barclay, Julia F. Thompson, and George H. Bowles); Horizon Lines, LLC (Robert Zuckerman), of counsel, for the plaintiff.

Tony West, Assistant Attorney General; Barbara S. Williams, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Edward F. Kenny and Jason M. Kenner); Michael Heydrich, Office of the Assistant Chief Counsel, U.S. Customs and Border Protection, of counsel, for the defendant.

Restani, Chief Judge:  Plaintiff Horizon Lines, LLC ("Horizon") challenges U.S.

Customs and Border Protection's ("Customs") partial denial of a protest against certain duties

required for repairs made to a vessel ("the Crusader") under 19 U.S.C. § 1466. Defendant United

States ("the Government") moved for summary judgment, and its motion was granted in part and

denied in part. Horizon Lines, LLC v. United States, 31 CIT 1853 (2007) ("Horizon I").

Subsequently, the parties filed a series of stipulations that resolved the remaining issues of

material fact, Joint Stipulation of Facts, Apr. 17, 2008; Stipulations, Sept. 15, 2008, and the court

entered partial judgment for Horizon, Horizon Lines, LLC v. United States, Slip Op. 08-109,

2008 Ct. Intl. Trade LEXIS 108 (CIT Oct. 15, 2008).   Horizon appealed and the United States

Court of Appeals for the Federal Circuit reversed the aspect of the court's grant of summary

judgment that held the repairs caused the lay-up and remanded.   Horizon Lines, LLC v. United

States, 341 F. App'x 629 (Fed. Cir. 2009) ("Horizon II").

        During trial, Horizon introduced evidence supporting a new business explanation

for the Crusader's lay-up.   The Government objected on the ground that such evidence was "a

wholesale change and there's no ability for the [G]overnment to go in and restart this whole

discovery process . . . ."   Trial Tr. 10:17 20, Feb. 22, 2010.   At that time, the court allowed

Horizon's witnesses to testify regarding its new position, but invited the Government to renew its

objection at a later date.   Id. at 18:16 19:13.   In response to the standing objection, the court held

admission of Horizon's trial exhibits 2, 3, 6, 11, and 21 in abeyance pending the outcome of the

Government's future motion.   The Government now renews its objection in the form of a motion

in limine.   For the reasons stated below, the court denies the Government's motion and admits

trial exhibits 2, 3, 6, 11, and 21 into evidence.

## BACKGROUND

        The facts of this case have been well documented in previous opinions.   See

Horizon II, 341 F. App'x at 629 31; Horizon I, 31 CIT at 1853 55.   The court presumes

familiarity with these decisions, but briefly summarizes the relevant undisputed facts.

The Crusader, a U.S.-flag vessel operated by Horizon primarily for trade in the Caribbean, was required to undergo American Bureau of Shipping ("ABS") inspections by September 25, 2001, or cease operating commercially after that date. See Uncontested Facts ¶¶ 3  4, available at Pretrial Order Joint Schedule C; Pl.'s Ex. 84, at J67; Pl.'s Ex. 85, at J120; Trial Tr. 253:10  13, Feb. 23, 2010. Under the ABS guidelines, however, this deadline would be suspended if the vessel were placed in lay-up. Horizon I, 31 CIT at 1854  On September 7, 2001, the Crusader went into lay-up at Karimun Sembawang Shipyard ("KSS") in Indonesia. Id. The Crusader remained in lay-up at KSS until November 28, 2001, when it was towed to Jurong Shipyard ("Jurong") in Singapore. Id. While at Jurong, the Crusader was placed in dry-dock and underwent inspections and certain repairs, satisfying the ABS requirements. Def.'s Ex. S, at 3  4.

On January 7, 2002, the Crusader departed Singapore for the United States and arrived on January 25, 2002. Uncontested Facts ¶ 15; Pl.'s Ex. 77, at J57. At that time, Horizon was required to notify Customs of all foreign repairs conducted on the Crusader because such repairs were dutiable at a rate of 50 percent ad valorem pursuant to 19 U.S.C. § 1466. See 19 U.S.C. § 1466(a). In August 2002, Customs concluded that Horizon owed $ 810,295.99 in duties, which included the cost of the lay-up at KSS, and liquidated the repair entry. Pl.'s Ex. 86, at J78  80. Horizon protested this determination in November 2002, insisting that the Crusader's lay-up was not a cost of repair. Pl.'s Ex. 80, at J82  92. In December 2004, Customs granted the protest in part and denied it in part, reducing the duties to $534,636.14. Pl.'s Ex. 81, at J107; Def.'s Ex. Q, at 3.

In July 2005, Horizon commenced this action, challenging Custom's partial denial

of the protest and seeking a refund of all excess duties paid.  Horizon maintained that its decision

to lay-up the Crusader was based, in the main, on a seasonal decline in the Puerto Rico trade and,

in any case, was entirely separate from the later repairs conducted at Jurong.  See Horizon II, 341

F. App'x at 631.  The Government moved for summary judgment, and the court granted the

motion in part and denied it in part, holding that the lay-up at KSS was a cost of repair because

Horizon failed to present evidence that the KSS lay-up was not caused, at least in part, by the

dry-dock at the nearby Jurong Shipyard.  Horizon I, 31 CIT at 1853, 1857, 1875 76.  The Federal

Circuit, however, reversed this decision, reasoning that Horizon's evidence suggested that the

Crusader was laid-up at KSS because of a variety of reasons, including seasonal considerations

and the company's contractual obligation to transport empty containers to Hong Kong.  Horizon

II, 341 F. App'x at 633.  The Federal Circuit, therefore, remanded this case for "further

proceedings."  Id. at 634.

      In February 2010, the court held a trial de novo.  During the time between its

successful appeal before the Federal Circuit and the commencement of the trial de novo before

the Court of International Trade, Horizon uncovered evidence indicating that its prior position

that the Crusader was laid-up because of a seasonal decline in the Caribbean trade was incorrect.

Pl.'s Opp'n Def.'s Renewed Mot. In Limine 11 12.  Rather, new evidence suggested that the

Crusader was laid-up because Horizon decided to alter its Midweek Express Service in the

Pacific Trade Lane ("MWX service"), which resulted in the elimination of the Crusader's new

route.  Horizon's Post-Trial Br. 6 12.  Before Horizon presented this evidence at trial, however,

the Government objected and asked the court to exclude any testimony relating to this theory on

the grounds that it was a complete reversal of Horizon's earlier position.  Trial Tr. 9:2  10:24,

Feb. 22, 2010.  Although the court decided to proceed with the trial and provisionally allow the

evidence, it also informed the Government that it would allow a later challenge on the basis of

discovery violation, judicial estoppel, or law of the case, as appropriate.  Id. at 18:15  19:13.  The

Government now moves in limine and asks the court to estop Horizon from advancing its new

position that the discontinuation of the company's MWX service was the reason for the

Crusader's lay-up at KSS.  The Government does not rely on any discovery violations by

Horizon.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(a).  As a trial court, it

decides issues of fact de novo.  See 28 U.S.C. § 2640(a)(1).  Judicial estoppel "is an equitable

doctrine invoked by a court at its discretion."  New Hampshire v. Maine, 532 U.S. 742, 750

(2001) (internal quotation marks and citation omitted).

## MOTION IN LIMINE

The Government claims that Horizon should be judicially estopped from changing

its position at this stage of the litigation because the new position is inconsistent with its original

position as recognized by the Federal Circuit, and if such change were allowed, Horizon would

gain an unfair advantage.  Def.'s Mot. in Limine 4  7.  The court disagrees.

Generally, if a litigant "assumes a certain position in a legal proceeding, and

succeeds in maintaining that position, he may not thereafter, simply because his interests have

changed, assume a contrary position, especially if it be to the prejudice of the party who has

acquiesced in the position formerly taken by him." <u>Davis v. Wakelee</u>, 156 U.S. 680, 689 (1895).

"This rule, known as judicial estoppel, . . . prevents a party from prevailing in one phase of a case

on an argument and then relying on a contradictory argument to prevail in another phase." <u>New

Hampshire</u>, 532 U.S. at 749 (internal quotation marks and citation omitted).  Although "[t]he

circumstances under which judicial estoppel may appropriately be invoked are probably not

reducible to any general formulation of principle," the Supreme Court provided that "several

factors typically inform the decision whether to apply the doctrine in a particular case . . . ." <u>Id.</u>

at 750 (internal quotation marks and citation omitted).  The Federal Circuit summarized these

factors as:

> (1) whether the party's later position [is] clearly inconsistent with its earlier
> position; (2) whether the party has succeeded in persuading a court to accept that
> party's earlier position, so that judicial acceptance of an inconsistent position in a
> later proceeding would create the perception that either the first or the second
> court was misled; and (3) whether the party seeking to assert an inconsistent
> position would derive an unfair advantage or impose an unfair detriment on the
> opposing party if not estopped.

<u>Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States</u>, 593 F.3d 1346, 1354 (Fed.

Cir. 2010) (internal quotation marks and citation omitted).  The court will examine each of these

factors.

   First, the court considers whether Horizon's positions are inconsistent.  Horizon

argues that its position is consistent because it has maintained the same legal argument

throughout this litigation.  Pl.'s Opp'n Def.'s Renewed Mot. <u>In Limine</u> 2  4.  For the purposes of

judicial estoppel, however, courts may consider legal and factual positions separately.  <u>See

Trustees in Bankr.</u>, 593 F.3d at 1355.  Until recently, Horizon claimed that the Crusader was laid-

up at KSS largely because of a seasonal decline in the Puerto Rico trade.  See Horizon II, 341 F.

App'x at 633; Horizon I, 31 CIT at 1857.  Now, Horizon advances a theory that the lay-up

occurred because of its discontinuation of the MWX Pacific trade service, a fact not asserted

before appeal.  Horizon's Post-Trial. Br. 3.  It is clear, therefore, that Horizon's prior and current

factual assertions are inconsistent, regardless of whether its legal arguments remain unchanged.[1]

This factor weighs in favor of applying the doctrine of judicial estoppel.

Next, the court addresses whether Horizon "succeeded in persuading a court to

accept [its] earlier position, so that judicial acceptance of an inconsistent position in a later

proceeding would create the perception that either the first or the second court was misled."

Trustees in Bankr., 593 F.3d at 1354 (internal quotation marks and citation omitted).  The

Government argues that this factor weighs in favor of judicial estoppel because "Horizon was

successful in persuading both this Court, and the CAFC to adopt its prior position."  Def.'s Mot.

in Limine 5.  Although the Federal Circuit has stated that "the important portion of the second

New Hampshire factor seems to be whether the party was successful in getting a court to adopt

its earlier position, not whether the party misled the courts," Trustees in Bankr., 593 F.3d at

1355, case law illustrates that the doctrine of judicial estoppel "is not meant to be a technical

---

[1] While arguing the general factual proposition that the lay-up was due to lack of need for
the Crusader, Horizon presented what turned out to be incorrect underlying facts before both this
court and the Federal Circuit, and the court considered those alleged facts.  As the court observed
during trial, there "might be a reason to impose some sanctions . . . if proceedings were
multiplied or needlessly complicated or delayed because someone had documents that they
should have presented."  Trial Tr. 12:23  13:3, Feb. 22, 2010.  Thus far, there has been no motion
to impose sanctions, but the court, sua sponte, will not award costs to Horizon, the prevailing
party, as it is responsible for likely unnecessary proceedings causing the Government and the
courts time and expense.

defense for litigants seeking to derail potentially meritorious claims, especially when the alleged

inconsistency is insignificant at best and there is no evidence of intent to manipulate or mislead

the courts," Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 365 (3rd Cir.

1996).  The inconsistency is not total, but it is not insignificant.  See supra note 1.  Nonetheless,

there is no evidence of any intent to mislead on Horizon's part.  While it obviously was of the

belief that the expensive lay-up at KSS was not due to the repairs at nearby Jurong, it simply did

not get to the bottom of the matter during its initial efforts to get the relevant causal information

from its various components.  In this case, if Horizon were precluded from submitting evidence

in support of its MWX service theory, the court would essentially force it to maintain a position

that everyone now acknowledges is incorrect, based on a technicality.  It is difficult to conceive

how this result would "protect the judiciary, as an institution, from the perversion of judicial

machinery."  See Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 (6th Cir. 1982).  Thus, given

the strange and unique facts of this case, party intent is more important than it might have been in

other cases.[2]  See Wang Labs., Inc. v. Applied Computer Scis., Inc, 958 F.2d 355, 358 (Fed. Cir.

1992) (stating that the doctrine of judicial estoppel is available under First Circuit law  "when

intentional self-contradiction is being used" (internal quotation marks and citation omitted)).

The second factor, therefore, weighs in favor of not applying the doctrine of judicial estoppel,

---

[2] In Trustees in Bankruptcy, the plaintiff successfully persuaded the United States
Department of Commerce that a certain duty order revocation was effective on October 1, 2003,
despite the foreign industries' request of a much earlier date.  593 F.3d at 1349.  A year later, the
plaintiff asked Commerce to reconsider its decision and to adopt the foreign industries' originally
proposed date because it "changed its mind about the proper effective date."  Id.  The plaintiff in
Trustees in Bankruptcy, therefore, changed positions merely because it was more advantageous
to do so.  See id.  By contrast, Horizon is attempting to correct its earlier position, based on new
factual information.

because there is no reason to believe that Horizon submits its new version of the facts for any

reason other than to correct its earlier inadvertently false statements.  The court concludes that

had Horizon known the facts, it would have revealed them and relied on them.

Finally, the court examines whether the allowance of Horizon's new position

provides Horizon with an unfair advantage or causes the Government an unfair detriment.  The

Government argues that Horizon received an unfair advantage because the Government was

"unable to properly prepare for trial on this issue, and [its] ability to present a full defense at trial

was irreparably curtailed."[3]  Def.'s Mot. in Limine 7.  The Government, however, admitted at

trial that it failed to request additional time to investigate further the new assertions and

furthermore, fully participated in and initiated part of the supplemental discovery that led to

Horizon's new position.[4]  See Trial Tr. 222:23  223:15, Feb. 23, 2010.  In addition, considering

the mounting testimonial and consistent documentary evidence in support of Horizon's new

---

[3] The Government additionally claims that "[h]ad Horizon informed the CAFC of its
erroneous position, for which it had an obligation to know and inform the Court, this case would
have been affirmed and the trial would not have occurred."  Def.'s Mot. in Limine 6.  It is
difficult to put the genie back in the bottle.  Therefore, the court cannot say with any certainty if
this is true.  It appears that Horizon knew that its original factual assertion was incorrect in major
part only when it discovered new evidence.  What the Federal Circuit would have done if asked
to remand the matter because of new evidence is unclear.

[4] After Horizon II, both parties consented to additional discovery in a joint status report,
filed with the court in October 2009.  Joint Status Report, Oct. 26, 2009.  During the
supplemental discovery period, Horizon served the Government with a set of supplemental
interrogatory responses and documents that indicated, for that first time, that the Crusader's lay-
up at KSS was motivated by the cancellation of its "mid-week Hawaii service."  See Pl.'s Opp'n
to Def.'s Renewed Mot. In Limine Ex. 4, at 2  3.  Five days later, the Government expanded the
scope of the supplemental discovery by serving a notice to depose further certain Horizon
witnesses regarding this new information.  See id. Ex. 5.  These depositions basically made clear
the facts that were presented at trial.

position, it is difficult to imagine how further discovery would yield new evidence to aid the

Government in proving that the Crusader was laid-up because of its impending repairs at Jurong.

Moreover, the Government has not spelled out the nature of such discovery.  Thus, unfairness is

not demonstrated.  The third factor, therefore, weighs in favor of not applying the doctrine of

judicial estoppel.

            In sum, had plaintiff presented a more credible version of the facts in opposition

to the Government's motion for summary judgment, it is likely that there would have been a trial

before the appeal, and two courts would not have had to engage in largely unnecessary acts.

Nonetheless, the court has been directed to have a trial <u>de novo</u>, which would be meaningless if

plaintiff were limited to its abandoned pre-appeal version of the facts.  Further, the court finds

plaintiff did not act in bad faith, but uncovered new evidence in trial preparation and in agreed-

upon supplemental discovery.  A large sum of money is at issue and, at this point, granting the

motion in limine seemingly would result in pure windfall to Defendant.  Finally, the court's duty

is to resolve disputed facts while an action remains open.  The Government's motion is denied.

The testimony of plaintiff's witnesses and trial exhibits 2, 3, 6, 11, and 21 are admitted as

evidence.

## FACTS

            At trial, Horizon presented two witnesses, Peter Strohla and Joseph Breglia, to

testify as to the circumstances surrounding the decision to lay-up the Crusader at KSS in

September 2001.[5]  The Government did not present evidence undermining their testimony and

---

[5] Strohla is currently employed by Horizon as the director of a group called the edge team,
(continued...)

the court credits it as follows.[6]

In 2001, Horizon had sixteen ships, fifteen of which were deployed in three trade lanes.[7]  Trial Tr. 36:15 25, Feb. 22, 2010.  These trade lanes, which consisted of various services that ran between certain designated locations, were called Alaska, Puerto Rico, and Pacific.  Id. at 35:17 20.  The Pacific Trade Lane involved the coordination of five ships, traveling in different circles at different frequencies, resulting in "a carousel" that guaranteed a vessel's availability in a certain location on the same day every week.  Id. at 38:9 20, 39:3 5.  Relevant to this litigation, Horizon's Pacific Trade Lane included the TP1 service, the CHX service, and the MWX service.  See id. at 38:22 25.

In 2001, Horizon developed a plan that would enable it to dry-dock[8] two ships, the Crusader and the Reliance, in Asia without an interruption of service.  Id. at 39:19 24.  At that time, the Crusader was deployed in the Puerto Rico Trade Lane, see id. at 40:23 24, and the Reliance was deployed in the Pacific Trade Lane's CHX service, id. at 46:20 23.  The plan

---

[5](...continued)
a process improvement group.  Trial Tr. at 26:21 27:2, Feb. 22, 2010.  At the time of the lay-up, he was a manager of vessel network operations.  Id. at 27:9 15.  Breglia is currently employed by Horizon as a vice president and general manager of its Ocean Transportation Services.  Id. at 75:14 16; 76:2 3.  In 2001, he was a senior port engineer.  Id. at 76:1 11.

[6] The court notes that Joseph Walla, Horizon's supervisory port engineer, also testified at trial.  Trial Tr. 197:17, Feb. 23, 2010.  In 2001, Walla was employed by Horizon as a port engineer.  Id. at 197:19.  Walla's testimony is not relevant to the court's findings of fact.

[7] Horizon's sixteenth ship served as a spare used to replace a deployed ship if it needed to be removed from service.  Trial Tr. 36:22 25, Feb. 22, 2010.

[8] A dry-dock involves a series of surveys, which include an inspection of the bottom of a ship and an inspection of all sea valves.  Id. at 85:15 18.

required another ship to replace the Crusader in the Puerto Rico Trade Lane, allowing Horizon to

transport some cargo, i.e., empty containers, through the Panama Canal to Asia and dry-dock at

Jurong Shipyard sometime in July and August 2001, for thirty-five days.[9] Id. at 39:13 20,

45:2 15, 78:22 25.  The Crusader would then come out of dry-dock and replace the Reliance in

the Pacific Trade Lane's TP1 service, allowing the Reliance to dry-dock for repairs.  Id. at

39:22 40:2, 58:19 22.  The Crusader would cover the TP1 service until it crossed paths with the

ship covering the MWX service, at which point the two vessels would switch and the Crusader

would stay in the MWX service.  Id. at 40:10 14, 42:3 20.

        This plan changed, however, when Horizon decided to discontinue its MWX

service, thus eliminating the commercial necessity of an additional vessel.  Id. at 47:19 22,

48:6 13, 60:22 25; see Pl.'s Exs. 2, 6, 11.  Due to this development, Horizon altered its original

plan and decided to dry-dock the Reliance first, letting it take the Crusader's scheduled place at

Jurong Shipyard.  Trial Tr. 79:13 20, Feb. 22, 2010.  Instead of repairing the Crusader by its

deadline, Horizon obtained a thirty day extension from ABS, moving the repair deadline from

August to September 25, 2001.  Id. at 81:8 12.  This would allow the Crusader to cover the TP1

service until the Reliance came out of dry-dock, at which time the Crusader would be placed into

lay-up.  Id. at 81:11 23; see Pl.'s Ex. 3.  In accordance with Horizon's new plan, the Crusader

completed its TP1 service voyage on September 5, 2001, and on September 7, 2001, the Crusader

was placed into lay-up at KSS, despite the possibility, which existed at the time of planning in

---

[9] The movement of empty containers to the Pacific does not cut one way or the other.  It is
not useful to move a ship in an empty condition whether the move is to effectuate a repair or to
move to a new cargo service.  Thus, that Horizon sought out some cargo to move as it
repositioned its vessel is ultimately unimportant.

June, of placing the Crusader in dry-dock almost immediately after its final TP1 voyage.[10] Id. at

80:4  16, 96:24  25, 148:19  21; see Def.'s Ex. D.

        After the terrorist attacks on September 11, 2001, Horizon considered altering its

plan yet again because it anticipated an urgent need for the Crusader.  Trial Tr. 97:6  22, Feb. 22,

2010.  Horizon sought dry-dock availability as soon as possible and received several offers from

various shipyards with the capacity to accommodate the Crusader in September, October, and

November 2001.  Id. at 97:21  22, 98:4  100:2; see Def.'s Ex. K.  Specifically, Jurong offered to

begin repairs on the Crusader in October with dry-dock accommodations available the first week

of November, Trial Tr. 98:10  12, Feb. 22, 2010; Def.'s Ex. N, and KSS offered availability as

early as September 26 or 28, 2001, Trial Tr. 101:5  10, 106:18  107: 3, Feb. 22, 2010; see Def.'s

Ex. L.  The expected need for the Crusader, however, never materialized, and therefore, Horizon

decided to leave it in lay-up at KSS.  Trial Tr. 107:4  12, 185:7  15, Feb. 22, 2010.  On

November 28, 2001, the Crusader was towed from KSS to Jurong, was placed in dry-dock, and

underwent the required surveys and repairs.  See id. at 132:6  10.

        At trial, Horizon also provided expert testimony, which the court credits, that it

could have sought and probably would have received an additional three-month extension from

ABS for the Crusader if it had use for the vessel.[11]  Trial Tr. 253:10  13, 254:15  21, 257:10  14,

---

[10] The Government contends that Horizon's case fails because there is no evidence about
the details of the cessation of the MWX service.  See Def.'s Post-Trial Mem. Law 24  30.
Neither party apparently thought this evidence was necessary.  The court will not speculate that
some non-existent evidence might undermine the testimony of Horizon's witnesses indicating
that the Crusader was slated for the MWX service and that such service was discontinued.

[11] Horizon's expert on ABS procedures, James Dolan, is currently the president of Martin,
                                                                                    (continued...)

Feb. 23, 2010.

## DISCUSSION

The Government contends that a portion of expenses associated with the
Crusader's lay-up at KSS were dutiable as "expenses of repairs" under 19 U.S.C. § 1466(a).
Specifically, the Government argues that it "proved at trial that the KSS lay-up of the
CRUSADER in 2001 was, in part, necessitated by the unavailability of Jurong Shipyard,
Horizon's preferred repair contractor, and therefore the lay up enabled or furthered the repair
project as a whole."[12]  Def.'s Post-Trial Mem. Law 6.  The Government contends that the lay-up
expenses, therefore, are "dual purpose expenses which furthered both dutiable repair work and
the non-dutiable operations which took place at Jurong Shipyard."  Id. at 5.  The court disagrees.

Pursuant to 19 U.S.C. § 1466(a), "expenses of repairs made in a foreign country
upon a vessel documented under the laws of the United States to engage in the foreign or
coasting trade . . . shall . . . be liable to entry and the payment of an ad valorem duty of 50 per
centum of the cost thereof . . . ."  19 U.S.C. § 1466(a).  The Federal Circuit has interpreted
"'expenses of repairs' as covering all expenses (not specifically excepted in the statute) which,
but for dutiable repair work, would not have been incurred."  Texaco Marine Servs., Inc. v.
United States, 44 F.3d 1539, 1544 (Fed. Cir. 1994).  Additionally, "[i]n the context of dual-

---

[11](...continued)
Ardenway, VanHellin & Dolan, a marine consultant company.  Trial Tr. 234:15  25, Feb. 23,
2010.  Dolan previously worked for ABS for twenty-six years.  Id. at 235:9  19.

[12] The preference for repair at Jurong was likely one motive for moving the Crusader to
the Pacific.  Nonetheless, the extensive lay-up in the Pacific, which eventually occurred, is
attributable to service changes and lack of commercial use for the vessel once it was in the
Pacific.

purpose expenses," which are expenses necessitated by both dutiable and non-dutiable work, 19

U.S.C. § 1466(a) "impose[s] the duty on only that portion of the expense that is fairly attributable

to the dutiable repairs." SL Serv., Inc. v. United States, 357 F.3d 1358, 1362 (Fed. Cir. 2004).

      The Government's legal argument is based on its understanding that the trial

evidence demonstrates that the Crusader's lay-up at KSS was caused by or was fairly attributable

to Jurong's inability to dry-dock the Crusader until November 2001. See Def.'s Post-Trial Mem.

Law 7. Not only does the possibility of an additional three-month ABS extension, as testified to

by Dolan, indicate that Horizon could have continued to operate the Crusader commercially until

Jurong was able to accommodate the ship in November 2001, but the various offers to dry-dock

the Crusader in September and October 2001 also demonstrate that Horizon could have satisfied

the ABS requirements much sooner than it ultimately did.[13] Thus, the evidence indicates

Horizon could have continued its commercial operation of the Crusader if it so desired. The

court, therefore, finds that Horizon's decision to lay-up the Crusader was based on its lack of a

commercial use for the vessel after September 5, 2001. The court also finds that the Crusader's

lay-up at KSS was independent of the later repairs performed at Jurong Shipyard. Without a

causal link between the repair and the lay-up, case law makes clear that the lay-up at KSS is not

an expense of repair. See Texaco, 44 F.3d at 1544 (providing that "'expenses of repairs' does

not cover expenses that would have been incurred even without the occurrence of dutiable repair

work"). The expenses incurred by Horizon for the Crusader's lay-up at KSS, therefore, are not

---

[13] The Government emphasizes Horizon's preference for the Jurong Shipyard. Assuming that a short amount of the lay-up time is attributable to this preference, it is only incidental and not a significant cause of the lay-up. See Horizon II, 341 F. App'x at 634 (providing that "[t]he mere coordination of Crusader's lay-up and repairs does not mean one furthers the other").

Court No. 05-00435                                                    Page 16

dutiable "expenses of repairs" under 19 U.S.C. § 1466(a).

## CONCLUSION

Judgment will be entered for the plaintiff in this Customs valuation action.  After

consultation with Defendant, Plaintiff will prepare an appropriate judgment, to be submitted to

the court within twenty days hereof.


                                                 /s/ Jane A. Restani
                                                 Jane A. Restani
                                                 Chief Judge

Dated: This 31st day of August, 2010.
        New York, New York.

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of  the  court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: August 31, 2010         By: /s/ Steve Taronji
                                   Deputy Clerk